# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LINDA PINTRO,                              :
                                           :
    Plaintiff,            :    Civil Action No.:    17-2090 (RC)
                                           :
    v.                    :    Re Document No.:    21
                                           :
AJIT PAI, Chairman,                        :
Federal Communications Commission,         :
                                           :
    Defendant.            :

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Linda Pintro is an attorney at the Federal Communications Commission ("FCC" or "the Agency") who has been litigating discrimination claims against the Agency since 2013. Those claims are still being litigated in another case elsewhere in the District Court. The claims at issue in this litigation date from 2015 and 2016. Pintro alleges that at that time the FCC, and the FCC Office of General Counsel ("OGC") in particular, took adverse actions against her in retaliation for her first discrimination lawsuit. She says the Agency violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, in three ways: (1) when it rescinded an offer of permanent lateral reassignment; (2) when it permanently transferred her without her consent; and (3) when OGC attorneys interfered with her employment and opportunities for advancement by requiring her supervisors to monitor her too closely. The FCC has moved for summary judgment. For the reasons set forth below, the motion is granted. Pintro has not produced sufficient evidence from which a reasonable jury could find in her favor on her retaliation claim.

# I. FACTUAL BACKGROUND

Pintro has worked for the FCC for many years. From November 2000 through June 2016, her position of record was as a Senior Legal Advisor in the FCC's International Bureau ("IB"), Strategic Analysis and Negotiation Division ("SAND"). Mot. for Summ. J. ("MSJ") Ex. B, Pintro Deposition Excerpts at 9–11, ECF No. 20-3 at 67–39; MSJ Ex. A, Pl.'s Responses to Def.'s First Set of Discovery Requests, Request for Admission ("RFA") Nos. 19–20, ECF No. 20-2 at 27. This was a GS grade 15, step 10 position. RFA No. 26. Beginning on September 14, 2014, Pintro was detailed from her position of record in IB, SAND to the Public Safety and Homeland Security Bureau ("PSHSB"), Cybersecurity and Communications Reliability Division ("CCR"). RFA No. 19. Pintro has explained, and the FCC has not disputed, that details are typically temporary assignments that do not ordinarily last more than 120 days. Def.'s Mem. of Points and Authorities in Supp. of MSJ at 4, ECF No. 21 at 6 (citing Compl. ¶ 27.) Pintro remained on detail to PSHSB, CCR until January of 2016. RFA No. 19. Accordingly, she needed to obtain formal approval to stay on this detail every four months for about fifteen months. Pl.'s Opp'n to MSJ ("Opp'n") at 3, ECF No. 23.

Pintro has also been involved in litigation against the FCC for many years. The retaliation claims at issue in this matter describe alleged retaliation for an earlier set of discrimination claims brought by Pintro. These related to how she was treated in SAND from 2003 to 2008, and a lawsuit based on these claims was filed in this Court in 2013. *See Pintro v. Genachowski*, No. 13-cv-231 (Feb. 22, 2013). In that first case, Pintro alleged that she was discriminated against based on her race and national origin, and that she was retaliated against, all in violation of Title VII. *See* Order, *Pintro*, No. 13-cv-231 (Sept. 12, 2019). That litigation is still ongoing as of the date of this decision. *See id.* (denying Defendant's Motion for Summary

Judgment). While the merits of that litigation have no bearing on this case, the mediation and settlement discussions that took place in that case in 2015 and 2016 make up a significant part of the factual background here.

On June 23, 2015, while Pintro was detailed to PSHSB, CCR, David Branch—Pintro's counsel in both the 2013 suit and in this suit—sent a settlement demand to Assistant U.S. Attorney Wyneva Johnson stating that Pintro would consider a transfer and other compensation as a means of resolving the 2013 suit. RFA No. 1. The next day he clarified that Pintro was specifically interested in a transfer to PSHSB, CCR, where she had been detailed for most of the past year. RFA No. 2. He sent a revised settlement demand to AUSA Johnson on October 16, 2015, now requesting that Pintro be permanently transferred to PSHSB, CCR as an Assistant Division Chief. RFA No. 3. The request was shared with Ellen Standiford, an Attorney Advisor in the FCC OGC, Litigation Division, who then circulated it to FCC's Chief Human Capital Officer, Tom Greene and to the relevant persons in IB and CCR. MSJ Ex. I, Affidavit of Ellen Standiford at 1–2, ECF No. 20-10; MSJ Ex. G, Dep. of Ellen Standiford at 19–20, ECF No. 20-8. The Chief of Staff of PSHSB told Standiford that PSHSB was amenable to having Pintro reassigned, but that CCR had no open supervisory spots—Pintro would have to be reassigned "with a title of Special Counsel or Senior Attorney" and would be in the bargaining unit, not in a management position. MSJ Ex. I at 2–3. Pintro's possible switch from management to the bargaining unit required approval from FCC Labor Relations, and Standiford confirmed with that office that the Union had no objections. *Id.* at 3.

On November 5, 2015, Judge Walton held a status hearing in the 2013 case. *See* Nov. 5, 2015, Minute Entry, *Pintro*, No. 13-cv-231. Johnson and agency counsel informed Branch that the FCC would agree to reassign Pintro to a bargaining unit position in PSHSB, CCR. RFA No.

4. Judge Walton referred the case to a Magistrate Judge for mediation. Nov. 6, 2015, Docket Order, *Pintro*, No. 13-cv-231.

In December 2015, Pintro's potential reassignment proceeded along two parallel tracks. Standiford continued communicating with PSHSB and, on December 18, she received a full position description for a GS-15 position in CCR with an official position title of Attorney Advisor and an organizational title of Senior Legal Counsel. MSJ Ex. I at 3. Around the same time, Pintro initiated conversations with Admiral David Simpson, her second-level supervisor at the time (on detail to PSHSB, CCR), in which she discussed the possibility of her moving from her detail in PSHSB, CCR to a permanent position in PSHSB, Policy and Licensing Division. RFA No. 6; MSJ Ex. A at 5.

On January 11, 2016, the parties met for a mediation session. MSJ Ex. I at 3. Pintro was informed that she could have the PSHSB, CCR, Senior Legal Counsel, bargaining-unit position that Standiford had been working to set up. *Id.* at 3–4. Pintro asked that she be reassigned to PSHSB, Policy and Licensing Division instead. *Id.* at 4; RFA No. 14. From Standiford's perspective, this was the first time this possibility had come up, and the FCC representatives at the mediation could not agree to it without consulting with PSHSB first. MSJ Ex. I at 4. Pintro says that this "was the first time that [she] had the opportunity to communicate directly with FCC counsel" but "den[ies] that this was the first time [she] had conveyed [her] desire to go to Policy and Licensing in PSHSB." RFA No. 14. She says she had spoken to Admiral Simpson in December about a lateral transfer, which would have entailed staying in a non-bargaining unit position. RFA No. 7. Pintro recalled the OGC attorneys telling her that they needed time to determine whether a permanent position in Policy and Licensing would be possible. MSJ Ex. B, at 60.

January 21, 2016 was Pintro's last day on detail to PSHSB, CCR.  RFA No. 19.  Her most recent detail was coming to an end and there were discussions around this time about where to put her while arrangements were being made for a permanent position.  *See* MSJ Ex. B at 57–60.  Beginning on January 22, 2016, she was detailed to PSHSB, Policy and Licensing Division.  RFA No. 20.  Pintro agrees with the FCC that this detail occurred at her request, and that her grade and step did not change as a result of the new detail.  RFA Nos. 21, 28.

On February 10, 2016, Pintro received an email attaching certain appointment paperwork from Sarah Van Valzah, the Assistant Bureau Chief in the IB, which was still technically the bureau to which Pintro was assigned, even though she had not actually worked there for well over a year.  MSJ Ex. L at 3, ECF No. 20-13; *see also* MSJ at 12.  Pintro responded to Van Valzah, and to Olga Madruga-Forti, Chief of a division in the IB, asking why she was being detailed to PSHSB again instead of being moved there permanently.  MSJ Ex. L at 2.  She had been under the impression that Madruga-Forti and Admiral Simpson had both agreed to a permanent transfer, and added that "[i]n this state I don't know what objective I am responsible for meeting, professional development I should pursue, and therefore, what my performance will be measured against."  *Id.*  Van Valzah responded, on March 2, explaining that she could not discuss the reassignment with Pintro because of the ongoing settlement discussions.  *Id.* at 1 ("[A] reassignment action is currently a component of a settlement offer in your pending litigation; accordingly discussions related to the reassignment should occur between your counsel and the AUSA.")  Pintro responded that "[m]any, many other people have gotten reassigned without it having to be part of a settlement.  The only reason why I haven't been reassigned is because I am suing the agency.  I believe that is the definition of retaliation."  *Id.*

The next day, March 3, 2016, Pintro emailed Susan Launer, an attorney in FCC OGC, informing Launer that she, Pintro, would be filing a retaliation complaint based on the withholding of her reassignment. MSJ Ex. M, ECF No. 20-14. Pintro expressed regret that she felt this was necessary. *Id.* Standiford replied the following day on behalf of OGC and attempted to explain:

> We're sorry it appears there has been some miscommunication. It is our understanding that the question of a permanent reassignment was first brought up by your counsel as part of a settlement offer, which is how it became associated with your pending litigation. The Agency, including OGC, IB, and PSHSB, has never objected to discussing or proceeding with a reassignment outside of a settlement context. At the mediation, however, the parties agreed that further discussions about reassignment should occur between Mr. Branch and the AUSA. Because you are a represented party and the reassignment was part of settlement negotiations, the AUSA is currently trying to confirm with Mr. Branch that he has no objections to you and the Agency directly discussing the issue of reassignment. Again, we are sorry if you think our office is doing anything to interfere with your reassignment. We are not.

*Id.* Standiford later testified that her office was informed that Pintro did not want to contact Branch or to have Branch talk to AUSA Johnson about a reassignment. MSJ Ex. I at 7; *see also* MSJ Ex. J at 2, Letter from Wyneva Johnson, Assistant U.S. Attorney, to David Branch (Mar. 15, 2016), ECF No. 20-11.

OGC then asked AUSA Johnson to reach out to Branch to ask if he would find it acceptable for the Agency to speak directly with Pintro about a reassignment. MSJ Ex. I at 7. OGC also asked AUSA Johnson to confirm with Branch that he had told Pintro that a non-management, bargaining unit position in PSHSB was what was being considered. *Id.* This second request was made because Pintro's communications with Van Valzah, which had been shared with OGC, suggested that Pintro did not know that the potential PSHSB assignment would be in the bargaining unit. *Id.* AUSA Johnson reached out to Branch, who asked her to send something in writing. *Id.*

AUSA Johnson sent Branch a letter on March 15, 2016, formally asking whether Branch had any objection to the FCC directly discussing the possibility of reassignment with Pintro. MSJ Ex. J at 1. The letter summarized some of the relevant settlement discussions, including the fact that in January AUSA Johnson had told Branch that FCC was willing to reassign Pintro to a bargaining unit, non-management position in PSHSB, Policy and Licensing, but that a settlement was not reached at that point because the Agency refused to meet other demands being made by Pintro. *Id.* at 2. AUSA Johnson explained that Pintro had been asking her IB management why she could not be reassigned, and that she had indicated her unwillingness to reach out to Branch about the matter. *Id.* The letter concluded by posing to Branch the two questions coming from OGC: Would Branch have any objection to the Agency discussing reassignment with Pintro directly? And had Branch communicated to Pintro that a bargaining unit, non-management position in PSHSB, Policy and Licensing had been offered? *Id.* at 2–3.

Another status conference in the first lawsuit was held on March 18, 2016, at which Branch explained he did not have a problem with the FCC discussing reassignment with Pintro directly. MSJ Ex. I at 7–8. Standiford conveyed this to the relevant persons at the Agency shortly thereafter. *Id.* at 8. Standiford testified that "OGC had no further involvement with Ms. Pintro's reassignment." *Id.*

While the attorneys were having these communications, on March 8, 2016, Pintro contacted an Equal Employment Opportunity ("EEO") counselor alleging, for the first time, that the OGC attorneys Standiford and Launer had retaliated against her in connection with her reassignment. MSJ Ex. N, Initial Contact and/or Counseling Session Form, ECF No. 20-15; RFA No. 40. On April 14, she received a Notice of Final Interview with EEO Counselor. MSJ Ex. O, ECF No. 20-16. This document informed her that she was entitled to file a formal

complaint but that she had to do so within the next fifteen days for it to be timely. *Id.*; RFA No. 43. Pintro acknowledges that she did not file a formal EEO complaint within this timeframe. RFA No. 44.

Pintro remained on detail to the Policy and Licensing Division until June 26, 2016 when she was reassigned to that same office. MSJ Ex. B at 132; *see also* MSJ Ex. C, Notification of Personnel Action, ECF No. 20-4. The position was at GS grade 15, step 10, and had the same salary as her previous position in IB. MSJ Ex. C at 2; MSJ Ex. B at 132–33. Pintro testified that the position description for this new role matched the position description that Admiral Simpson had given her in January 2016 when they were discussing a possible permanent reassignment to PSHSB, Policy and Licensing. MSJ Ex. B at 39; 133–34.

On August 25, 2016, Pintro was deposed in connection with her first lawsuit. RFA No. 39. Standiford testified that she had tried to contact Pintro's supervisor, Zenji Nakazawa, prior to the deposition but that she only managed to reach Michael Wilhelm, another supervisor in the Policy and Licensing Division. MSJ Ex. G at 61–62. Standiford explained that she was contacting these supervisors "to ensure that [Ms. Pintro] was not being required to use her own leave to attend the deposition." *Id.* at 62. On the afternoon before the deposition Nakazawa sent Pintro an email saying, "I am out of the office . . . but I did get notice that the AUSA wanted to depo you tomorrow and asked if I were not teleworking then, just fyi." MSJ Ex. P, ECF No. 20-17. Standiford testified that she had not mentioned that Pintro should say she was teleworking, specifically, but only that Pintro should not have to use her own leave hours in order to attend the deposition. MSJ Ex. G at 62. Pintro did submit a request for 8 hours of annual leave for the day of the deposition. RFA No. 39. She never cancelled this request and says that the agency did not give her back the hours. RFA No. 37.

In the fall of 2016, Pintro filed two formal EEO Complaints. MSJ Ex. Q ("September 15 Complaint"), ECF No. 20-18; MSJ Ex. R ("October 24 Complaint"), ECF No. 20-19. Pintro met with an EEO counselor on September 1 and was provided a Notice of Right to File an official complaint on September 14. MSJ Ex. S at 2, ECF No. 20-20. The first formal complaint, filed on September 15, 2016, alleged that OGC, specifically Standiford, retaliated against her "when[,] having failed to prevent [her] transfer from IB to PHSHB, OGC notified [her PSHSB supervisors] that the Department of Justice wanted to take [her] deposition on 8/25/2016, and inquired whether [she] had indicated that [she] would be teleworking on that day." September 15 Complaint at 3. She said this call "was a deliberate effort to punish [her] for getting the transfer on [her] own," and characterized it as "unlawful workplace surveillance." *Id.* at 3–4. Pintro acknowledges that this was her first formal EEO Complaint relating to the retaliation at issue in the Complaint. RFA No. 45. Pintro again met with an EEO counselor on October 4 for another initial interview, and, on October 11, she was again notified of her right to file a formal complaint. MSJ Ex. S at 2. Her second EEO Complaint was filed on October 24, and alleged that she was retaliated against based on her "June 2016 demotion from Senior Legal Advisor to Attorney Advisor." October 24 Complaint at 3. It alleged that the decision to give her "the title of Attorney Advisor[] deliberately ignores the greater responsibilities of [her] position description, and [her] designation as a management official pursuant to 5 USC 7103 (a)(11)." *Id.* at 3–4; *see also* 5 U.S.C. § 7103(a)(11) ("'[M]anagement official' means an individual employed by an agency in a position the duties and responsibilities of which require or authorize the individual to formulate, determine, or influence the policies of the agency . . . .").

In July of 2017, the FCC issued a Final Agency Decision dismissing the EEO Complaints and informing Pintro of her rights to file a civil suit in federal district court. MSJ Ex. S. On

October 10, 2017, Pintro filed her Complaint in this case, which alleges retaliation in violation of Title VII of the Civil Rights Act of 1964. Compl., ECF No. 1. Specifically, Pintro alleges that the Agency retaliated against her, in response to her allegations of discrimination in her first lawsuit, at three points, when it (1) "rescinded an offer of a permanent lateral reassignment to [PSHSB] as a Senior Legal Advisor[;]" and (2) "permanently transferred Plaintiff Pintro, without her consent, to PSHSB as an Attorney Advisor;" and when (3) "the Agency's Office of General Counsel interfered with Plaintiff Pintro's employment opportunities and impugned her reputation when it required one of Plaintiff Pintro's managers to report on her performance every two months; and contacted [Nakazawa]," about whether Pintro had said she would be teleworking on the day of her deposition in her earlier lawsuit. Compl. at 8–9. The Complaint stated that because of these actions, "Plaintiff Pintro's professional progression has been stymied and any opportunity for advancement at the Agency has been lost." *Id.* at 9.

After discovery, the FCC moved for summary judgment. MSJ, ECF No. 21. That motion is now ripe for decision.

## II. LEGAL STANDARD

### A. Summary Judgment

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court's inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the party opposing summary judgment must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In doing so, the nonmovant may not rely on "statements that are impermissible hearsay or that are not based on personal knowledge." *Shuler v. District of Columbia*, 744 F. Supp. 2d 320, 327 (D.D.C. 2010) (citation and quotations omitted). In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the nonmovant, *see Anderson*, 477 U.S. at 255.

Of particular relevance here, this Court has explained that "[s]ummary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements." *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008) (citations omitted). That is because "conclusory allegations" and "unsubstantiated speculation," whether in the form of a plaintiff's own testimony or other evidence submitted by a plaintiff to oppose a summary judgment motion, "do not create genuine issues of material fact." *Id.* at 200 n.12 (internal citation and quotation marks omitted); *see also Sage v. Broad. Publ'ns, Inc.*, 997 F.

Supp. 49, 53 (D.D.C. 1998) ("Conclusory allegations made in affidavits opposing a motion for summary judgment are insufficient to create a genuine issue of material fact.").

## B. Title VII Framework

Title VII of the Civil Rights Act of 1964 promises that "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). The antiretaliation provision of Title VII "[p]rohibits an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting § 2000e–3(a)). The three-part *McDonnell Douglas* burden-shifting framework applies when a Title VII plaintiff offers only indirect evidence of discrimination or retaliation at summary judgment. *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003) (applying the framework to a discrimination claim); *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 650–51 (D.C. Cir. 2003) (applying the framework to a retaliation claim, in addition to a discrimination claim). Under *McDonnell Douglas*, the plaintiff has the initial burden of production to establish a prima facie case of discrimination; if she does, then the employer must articulate a legitimate, non-discriminatory reason for its action; and if it does, then the plaintiff must receive an opportunity to show that the employer's reason was a pretextual cover for discrimination. 411 U.S. at 802–05. Although *McDonnell Douglas* shifts the burden of production between the parties, the plaintiff retains the burden of persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993).

"Assuming the employer [has] proffer[ed] [a legitimate, non-discriminatory] reason, the central question at summary judgment becomes whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (quotations omitted). An employee may not show pretext by "simply criticizing the employer's decisionmaking process." *Hairston v. Vance–Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014). For example, "[e]ven if a plaintiff 'was victimized by poor selection procedures,' [courts] may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Id.* (quoting *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). Rather, "[t]he plaintiff must identify evidence from which a reasonable jury could find that the employer's stated reasons were 'phony.'" *Moeller v. LaFleur*, 246 F. Supp. 3d 130, 140 (D.D.C. 2017) (quoting *Fischbach*, 86 F.3d at 1183). In addition, "[t]he evidence of record must be such that a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one." *Walker*, 798 F.3d at 1093; *see also Mount v. Johnson*, 174 F. Supp. 3d 553, 561 (D.D.C. 2016) ("[P]roviding sufficient evidence for a jury to reject the defendant's reason is not sufficient 'if it is nevertheless impossible for a rational factfinder to conclude the action was discriminatory.'" (quoting *Rochon v. Lynch*, 139 F. Supp. 3d 394, 404 (D.D.C. 2015))).

## III. ANALYSIS

### A. Offer of permanent lateral reassignment

Pintro first claims that she was retaliated against "when the Agency . . . rescinded an offer of permanent lateral reassignment to PSH[S]B as a Senior Legal Advisor." Compl. ¶ 38.

The Agency puts forward several arguments in favor of summary judgment on this claim, the first of which is that that Pintro failed to timely exhaust her administrative remedies for this claim. MSJ at 20. When a federal employee believes she has been discriminated against in violation of Title VII, she must contact an EEO Counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective dates of the action," so that they can try to resolve the matter informally. *See* 29 C.F.R. § 1614.105(a)(1). If the parties are unable to resolve the issue informally, the aggrieved person may file a formal administrative complaint within 15 days of receiving notice of her right to do so from the EEO counselor. *See id.* § 1614.106(b). Failure to file a formal administrative complaint within this timeframe renders any subsequent Title VII claim on the same grounds untimely for failure to exhaust administrative remedies. *See Schlottman v. Perez*, 739 F.3d 21, 27 (D.C. Cir. 2014).

Failure to exhaust administrative remedies under Title VII is an affirmative defense, and the burden therefore falls on the defendant to plead and prove the defense. *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997); *Koch v. Walter*, 935 F. Supp. 2d 143, 150 (D.D.C. 2013). If the defendant succeeds in meeting its burden, the burden then shifts to the plaintiff to put forth evidence that would justify the equitable avoidance of the defense. *See Rann v. Chao*, 346 F.3d 192, 195 (D.C. Cir. 2003); *Noisette v. Geithner*, 693 F. Supp. 2d 60, 68 (D.D.C. 2010). For exhaustion purposes, a timely-filed EEO charge encompasses claims that are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (citation omitted). To be sufficiently related in this manner, a claim "must arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Id.* (citation omitted).

The timeline here is not in dispute. On March 8, 2016, Pintro spoke to an EEO counselor and "complained that the Agency detailed her, instead of permanently transferring her, to the Policy Division and that OGC interfered with that reassignment." Statement of Material Facts of as to which there is no Genuine Dispute ("SOMF") ¶ 149, ECF No. 21; Complainant's Resp. to Agency's Statement of Undisputed Material Facts ("Resp. SOMF") ¶ 149, ECF No. 23-1. On April 14, she was given a Notice of Final Interview, which informed her that she had fifteen days to file a formal EEO complaint. SOMF ¶¶ 150–51; Resp. SOMF ¶¶ 150–51; RFA Nos. 43–44. She did not file anything within those fifteen days. SOMF ¶ 152; Resp. SOMF ¶ 152; RFA No. 44. These admissions, which are supported by the Agency's production of the relevant documents, MSJ Ex. N; MSJ Ex. O, are enough to show that the allegations Pintro raised with the EEO counselor in March 2016 were forfeit. *Wilson v. Clayton*, 272 F. Supp. 3d 25, 30 (D.D.C. 2017) ("If an aggrieved party fails to comply with [the EEOC regulations'] timeline, the discrete discriminatory act is 'not actionable.'" (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). The burden therefore returns to Pintro to argue why the administrative exhaustion requirement should not be applied to this first claim. *See Rann*, 346 F.3d at 195.

Pintro argues that this claim ought to proceed despite her failure to exhaust administrative remedies based on the rule that a claim not included in an administrative complaint may still be brought in federal court if "it is like or reasonably related to another claim or other claims that were exhausted administratively." *Caldwell v. ServiceMaster Corp.*, 966 F. Supp. 33, 49 (D.D.C. 1997) (citing *Park*, 71 F.3d at 907). She argues that the retaliation claim based on the rescission of an offer for permanent reassignment in January 2016 is "'like or reasonably related to' those claims in the administrative complaint[s] . . . for which [she] exhausted administrative

remedies," namely those Complaints that she filed in the fall of 2016. Opp'n at 13 (quoting *Pierson v. Wash. Metro. Area Transit Auth.*, 821 F. Supp. 2d 360, 364 (D.D.C. 2011)). As Pintro explains it, these later claims—about her permanent transfer in June 2016 and about OGC interference with her supervision—are both "rooted in [Pintro's] agreement with Admiral Simpson to be permanently reassigned and Defendant's decision to interfere and deny the reassignment." Opp'n at 13–14.

The "like or reasonably related" exception does not suffice to preserve Pintro's first claim because that exception is not properly applied retroactively in the way Pintro seems to argue for. Pintro analogizes to *Pierson*, where a plaintiff had successfully exhausted her administrative remedies for a claim that she was wrongfully terminated and was consequently permitted to add on improperly-exhausted claims that she was wrongfully not rehired. *Pierson*, 821 F. Supp. 2d at 366. In *Pierson*, "the plaintiff's non-rehire retaliation claim specifically related to and grew out of her initial EEOC charge." *Id.* This is consistent with the "like or reasonably related" exception, but Pintro's suggested application of the exception is distinct in two notable ways. First, the two claims in *Pierson* shared a significantly closer connection than Pintro's claims. Firing and failure to rehire are two sides of the same coin: refusing to rehire an unjustly fired employee is, essentially, refusing to remedy the initial violation of her rights. Pintro, on the other hand, posits that the alleged rescission in January of an offer for permanent reassignment ought to be viewed as "reasonably related" either to her transfer in June to an unwanted position or to interference by OGC with her supervision. The claims are not wholly unrelated, but are not nearly as closely connected as the claims in *Pierson*. Second, and more significantly, Pintro's argument inverts the temporal and logical relationship between the claims. She says that the preserved claims are "rooted in" the earlier, unpreserved claim, but even assuming that this is

true, it is the opposite of the situation in *Pierson*, where the unpreserved failure to hire claim was necessarily rooted in the earlier, preserved claim for wrongful termination.  *See id.*

   *Pierson* demonstrates how the "like or reasonably related" exception can carry along claims for actions subsequent to, or at least simultaneous with, properly preserved claims, but Pintro has pointed to no case showing that the exception should allow her to reach back in time for earlier claims that were never administratively exhausted.  As the Supreme Court explained in *National Railroad Passenger Corp. v. Morgan*, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  536 U.S. at 113.  Claims based on earlier acts that were not administratively exhausted may still be relevant and related to a plaintiff's broader case—the statute does not "bar an employee from using the prior acts as background evidence in support of a timely claim"—but these forfeited causes of action are not resuscitated when later discriminatory actions are challenged.  *Id.* Courts in this Circuit have noted that "it is unclear how broadly *Morgan*'s holding cuts" when it comes to the carrying along of claims based on *subsequent* discriminatory acts.  *Howard v. Kerry*, 85 F. Supp. 3d 428, 433 (D.D.C. 2015) (citing *Rashad v. Wash. Metro. Area Transit Auth.*, 945 F. Supp. 2d 152, 166 (D.D.C. 2013) (noting split among district courts)).  But there does not appear to be any support for the claim that it allows the kind of retroactive preservation of *prior* unpreserved claims that Pintro has attempted.

   Because the Agency has demonstrated that Pintro failed to administratively exhaust her first claim, and because Pintro has failed to show that the administrative exhaustion requirement should not apply, the Agency is entitled to summary judgment on this claim.  The Court therefore has no occasion to address the parties' alternate arguments on this claim.

## B. Permanent transfer without consent

Pintro's second claim is that she was retaliated against when the Agency "permanently transferred [her], without her consent, to PSHSB as an Attorney Advisor" in the Policy and Licensing Division in June of 2016. Compl. ¶ 38. At the time of the transfer, Pintro still held a position of record in IB, but had been detailed to PSHSB, Licensing and Policy Division since January 22, 2016. RFA No. 20. The transfer on June 26, then, only changed Pintro's position of record. She was "moved" to the same office she had been in for six months. *See* MSJ Ex. B at 132; *see also* MSJ Ex. C. The FCC argues first that this transfer did not constitute an adverse action actionable under Title VII and second that the agency had legitimate, non-retaliatory reasons for transferring Pintro. MSJ at 27–31.

### 1. Adverse Action

Even though a plaintiff does not need to establish each and every element of a prima facie case in order to defend against a motion for summary judgment, she still must show that she "has suffered an adverse employment action." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). To establish an adverse action in the context of a retaliation claim "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (quotations omitted). "Purely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation will not suffice." *Ortiz-Diaz v. U.S. Dep't of Housing & Urban Dev., Office of Inspector Gen.*, 867 F.3d 70, 73 (D.C. Cir. 2017) (quotations omitted). If "a reasonable juror could find that [the plaintiff] suffered an adverse action" then summary judgment on that ground is inappropriate. *Czekalski v. Peters*, 475 F.3d

360, 365 (D.C. Cir. 2007). However, even if a plaintiff has suffered an adverse action, his employer is still entitled to summary judgment if the employer "asserts a legitimate, nondiscriminatory reason for [the] adverse employment action," and plaintiff fails to produce "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008).

Pintro suggests two related ways in which her transfer was an adverse action that would have dissuaded a reasonable worker from making a charge of discrimination. First, she argues that the transfer came with a demotion from Senior Legal Advisor to Attorney Advisor. Opp'n at 22. This argument focuses only on the change in *title*. She acknowledges that her pay grade did not change, MSJ Ex. C at 2; MSJ Ex. B at 132–330, and makes no mention of any change in her duties.[1] Second, she argues that this "lower position" affected her future career opportunities and was detrimental to her possible advancement at the Agency. Opp'n at 22. Pintro fails to establish how a reasonable juror could find she suffered a materially adverse action because she has not produced evidence to establish that the "demotion" she alleges even occurred, let alone that would dissuade a reasonable worker from filing a charge of discrimination.

In arguing that her title changed to her detriment, Pintro is conflating two types of titles used by the federal government. As the Agency has pointed out, a "position title" and an "organizational title" refer to two different things. MSJ at 4 n.1–2. The Office of Personnel Management (OPM) is required by law "to establish the official titles of positions in published

---

[1] Pintro does not explain, nor does the Agency address, whether her duties changed at the time of the transfer when she went from being an IB employee detailed to PSHSB, Policy and Licensing to having a position of record in PSHSB, Policy and Licensing.

classification standards" and "[o]nly the prescribed title may be used on official documents relating to a position" including "position descriptions" and "personnel actions." U.S. Office of Personnel Management, TS-134 July 1995 ("OPM TS-134"), 14 (revised Aug. 2009).[2] But agencies are not restricted to using these official position titles. OPM says that "[u]nofficial titles (such as those relating to specific agency organizations or programs) may be appropriate and helpful for internal agency use." *Id.* This two-tier title framework is borne out by the personnel action forms that have been produced in this litigation. A position description for Pintro's original position in IB, SAND lists her "Official Title of Position" as "Attorney Advisor," and then identifies her "Organizational Title" as "Legal Advisor."[3] MSJ Ex. D at 1, ECF No. 20-5. The form that effectuated Pintro's transfer in June 2016 indicates that she held the position title "Attorney Advisor" both in IB and in PSHSB. MSJ Ex. C at 1, 2. On the position description form for her new position in PSHSB, Pintro's "Official Title of Position" is, again "Attorney Advisor," and the "Organizational Title" box is left blank. *Id.* at 3. The more detailed position description accompanying the form does indicate that the person holding that position "serves as senior attorney-advisor and legal expert." *Id.* at 4.

The record evidence thus makes clear that Pintro's official title was, at all times, "Attorney Advisor." This is not necessarily the end of the road for her argument, though, because it appears that she did lose the *organizational* title of "Legal Advisor" or "Senior Legal Advisor" when she was transferred. *Compare* MSJ Ex. D, *with* MSJ Ex. C at 3. She would still need to show, however, that the loss of an organizational title, alone, would be enough to dissuade a reasonable employee from making or supporting a discrimination charge.

---

[2] Available at https://www.opm.gov/policy-data-oversight/classification-qualifications/classifying-general-schedule-positions/positionclassificationintro.pdf.

[3] This space on the form reads: "Organizational Title or Position (if different from official title)."

The only evidence Pintro cites to support the idea that this change in title was an adverse action is the affidavit of Lauren Kravetz, Chief of Staff for PSHSB. MSJ Ex. K, ECF No. 20-12. In opposing summary judgment, Pintro argues that "Kravetz stated that the Senior Legal Advisor position denotes a certain level of experience and quality." Opp'n at 22. Pintro's paraphrase does not provide the full context of Kravetz's statement, which reads: "With the approval of their bosses, there are people in the FCC who are called Senior Legal Advisor because their boss[es] want to signify a certain level of ability or experience or a certain relationship to the organization." MSJ Ex. K at 5. This is entirely consistent with OPM's description of unofficial titles that "may be appropriate and helpful for internal agency use." OPM TS-134 at 14. Kravetz also downplayed the significance of organizational titles, saying that "[s]ometimes, attorneys will add 'Senior' in front of Attorney Advisor to signify that they have a great deal of experience, but it does not change their underlying Position Description, bargaining unit status, and/or managerial status." MSJ Ex. K at 5. Pintro cites nothing beyond Kravetz's testimony to explain why the loss of an organizational title, in and of itself, was an adverse action. She has not testified, for example, that in IB or in PSHSB her supervisors did in fact use organizational titles to suggest experience or ability. Nor has she testified that she asked and was not allowed to use an organizational title, or to add the word "Senior" in front of "Attorney Advisor." Additionally, the position description indicating that Pintro would "serve[] as senior attorney-advisor and legal expert" suggests that Pintro may have been regarded as having the status or experience Kravetz describes, even without an organizational title.

At her deposition, Pintro suggested that she was not able to function in the Agency's professional environment without an organizational title, but she did not identify how the loss of the title, specifically, caused this. *See* MSJ Ex. B. at 173. She said "When I go to a meeting, I

am not usually recognized as an attorney. I am often mistaken for a paralegal or someone's secretary." *Id.* While this may very well be a result of discrimination or bias, it is not tied to the lack of an organizational title. Pintro's official position title—"Attorney Advisor"—would clear up any misunderstanding of this sort just as well as an organizational title of "Legal Advisor" or "Senior Legal Advisor" would. The fact that she is often not recognized as an attorney, therefore, does not help establish that the loss of an organizational title was an adverse action.

Pintro says that the facts of her case are "essentially the exact" same as those considered by the D.C. Circuit in *Czekalski v. Peters*. *Id.* at 21. In that case, the plaintiff was a member of the FAA's Senior Executive Service (SES) who had supervised a staff of hundreds, managed a budget of at least $400 million, and reported directly to the FAA's Associate Administrator for Research and Acquisitions. *Czekalski*, 475 F.3d at 362, 364–65. This Associate Administrator then reassigned the plaintiff, memorializing that she had "not performed up to the standards I expect," and placing her in charge of "fewer than ten employees" with "little to no budget." *Id.* at 362, 365. Pintro emphasizes that in *Czekalski*, as here, the plaintiff "did not experience any loss of salary, grade level, or benefits." *Id.* at 364. This is true, but this framing overlooks *Czekalski*'s robust factual record of diminished responsibilities. *Czekalski* stands for the fact that a loss of salary or grade level is not necessary for an action to be adverse, but *Czekalski* does not help show how Pintro's loss of an organizational title is sufficient on its own to qualify as an adverse action.

Pintro also argues that her transfer was an adverse action because it "denied [her] the chance to exercise supervisory responsibilities, gain executive and management experience, and the opportunity to be part of the management team." Opp'n at 22. She describes the transfer as "being assigned to a lower position after 16 years, with an added connotation of less significant

responsibilities." *Id.* Crucially, however, this characterization of the transfer is supported by nothing more than citations to Pintro's own testimony, much of which contradicts the evidentiary record, and a single citation to Standiford's testimony, which is also mischaracterized. *Id.* at 22–23. Pintro says that Standiford testified "that [Pintro] was reassigned to a non-bargaining unit (management) position, then she ended up with a bargaining unit position after the transfer occurred." *Id.* at 23. In fact, Standiford said Pintro's position was "outside the bargaining unit," and described it as "a management official position." MSJ Ex. G at 38–39. Pintro also cites her own testimony to say that her reassignment "deprived her of her supervisory duties to review the work of more junior attorneys, which she had done in her prior position." Opp'n at 23. Pintro did testify that she "reviewed the work of more junior attorneys," MSJ Ex. B at 11, but no other evidence supports this claim. The broader suggestion that Pintro went from a role that was both managerial and supervisory to one that was neither is contradicted by the OGC position description forms for the two positions. These indicate that Pintro's original position in IB was "Managerial" but not "Supervisory" and that Pintro's position in PSHSB was also "Managerial" but not "Supervisory." *Compare* MSJ Ex. D at 1, *with* MSJ Ex. C at 3. The multipage position descriptions accompanying the OGC form tell a similar story—neither mentions any supervisory duties. *See* MSJ Ex. C at 4–11; MSJ Ex. D at 2–6. Despite the memorandum's contrary assertions, then, there is no evidence of a downgrade in terms of managerial or supervisory status beyond Pintro's own statement in her deposition that she reviewed the work of junior attorneys. Essentially, in describing the transfer's effect on her career prospects, Pintro has "failed to provide any evidence, beyond [her] conclusory assertions of loss of prestige, of any adverse consequence to [her] position or future career." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (affirming summary judgment to defendant).

Pintro also cites her own deposition testimony for the proposition that she "was unable to engage in the training opportunities provided to management personnel that she had attended in the past," and that she could not advance in her career without "additional experience with executive and management responsibilities to permit her to obtain a promotion to a position with the Senior Executive Service ("SES")."  Opp'n at 23 (citing Opp'n Ex. A at 63–65, ECF No. 23-2).  At this point in her testimony, Pintro was describing her concern that if she were placed in a bargaining unit, non-management position, she would lose access to opportunities that would help advance her career.  Opp'n Ex. A at 63–64.  She also cites her own testimony for the proposition that she was promised a management position but given a non-management position, but her actual deposition transcript says just the opposite.  Opp'n at 23 (citing Opp'n Ex. A at 33 ("The position description, yeah, it still is a management official position description.")).  Again, this is consistent with Standiford's testimony.  MSJ Ex. G at 38–39.  Pintro again compares her situation to *Czekalski* when suggesting that her new allegedly non-supervisory duties were unimportant, Opp'n at 23, but again Pintro overlooks crucial differences between the cases.  Ms. Czekalski was able to point to testimony from her supervisor corroborating the notion that she was demoted from an important position to an unimportant one and to the fact that her supervisor said he was reassigning her because of poor performance.  *See Czekalski*, 475 F.3d at 364–65.  Pintro, on the other hand, relies on her own vague and conclusory testimony to characterize and compare her two positions.

The Court is obligated to resolve all factual disputes in favor of the plaintiff at this stage, but "'conclusory allegations' and 'unsubstantiated speculation' do not create genuine issues of material fact" sufficient to survive summary judgment.  *Bonieskie*, 540 F. Supp. 2d at 200 n.12 (citing *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).  In suggesting that

her transfer in June 2016 was an adverse action, Pintro relies almost entirely on self-serving testimony which is contradicted by the record evidence of her position descriptions. She also mischaracterizes testimony—including her own—in her briefing. This is not evidence from which a reasonable jury could conclude that her permanent transfer to PSHSB, Policy and Licensing had an adverse impact on her professional career. Summary judgment is therefore appropriate with regard to Pintro's claim that her transfer in June 2016 was an act of retaliation.

### 2. Legitimate, Non-Retaliatory Reasons

The lack of an adverse action is enough to defeat this claim, but the Court also notes that Pintro has also failed to show or even to allege plausibly that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The FCC argues that "it is undisputed that [Pintro] was given the position she wanted, and, she admits, the position that that she claims Admiral Simpson promised to her." MSJ at 31. This explanation is consistent with the record evidence before the Court, and Pintro has failed to point to anything beyond her own conclusory and unsubstantiated testimony that would support her characterization of events.

Pintro repeatedly argues that she was not given the job that was promised to her by Admiral Simpson, but the relevant testimony does not support this claim. Her briefing quotes the Complaint and states that "[a]lthough they did not agree to a specific title, Plaintiff and Admiral Simpson agreed that 'going forward, her title and responsibilities would be at a minimum, Senior Legal Advisor.'" Opp'n at 24 (quoting Compl. ¶ 28). Admiral Simpson's testimony is inconsistent with this statement. When asked about this exact assertion from the Complaint at his deposition, Admiral Simpson said, "I don't see how I could have made that, any

kind of commitment like that," and, "I seem to recall that she wanted a specific title, and I also seem to recall that I communicated to her that I didn't have an ability to make a change to [a] position description." Opp'n Ex. L at 9, ECF No. 23-13. Pintro also cites to Standiford's affidavit as evidence of an agreement, *see* Opp'n at 24 (citing Opp'n Ex. K at 6), but Standiford said nothing in her affidavit about any promise from Admiral Simpson, *see* Opp'n Ex. K.

Pintro's own testimony and admissions fatally undermine her characterization of events. Pintro admitted that she does not have and is not aware of any documentation of a promise from Admiral Simpson that she would have the title of Senior Legal Advisor. RFA No. 10. Pintro testified that she did not "recall specifically what [Admiral Simpson] said" other than "that [she] would not be demoted as a result of accepting a transfer." MSJ Ex. B at 23. As the Court's above comparison of position descriptions makes clear, there is no evidence that any demotion took place. She also testified that, during their discussions in late 2015 and early 2015, Admiral Simpson handed her a copy of a position description which matched the position description that would be attached to the Notice of Personnel Action that effectuated her transfer in June 2016. *Id.* at 47–49 (discussing MSJ Ex. C (Pintro Dep. Ex. 11)). In other words, her own testimony was that the position she was transferred into was the one she discussed with Admiral Simpson.

This is hardly suggestive of pretext. There would have been no need for the Agency to lie about its motives, because Pintro was being transferred to the position she had expressed an interest in, located in the department where she had been working for six months. Pintro has failed to put forward evidence suggesting that the Agency's stated reasons for transferring her are pretextual, and has not even explained what she believes transpired in a manner consistent with the evidence. Summary judgment is therefore also appropriate on this alternative ground that the agency's legitimate non-retaliatory reasons have not been rebutted.

### C. Interference with Employment

Pintro's third claim is that she was retaliated against when OGC "interfered with [her] employment opportunities and progression and impugned her reputation." Compl. ¶ 38. Pintro claims that OGC did this at two points: first "when it required one of Pintro's managers to report on her performance every two months;" and again when it "contacted Pintro's supervisor, Nakazawa, and informed him that Pintro had an EEO case pending in federal court and asked him if Pintro requested to telework on the day she gave a deposition in August 2016 in her case pending in federal court." Compl. ¶ 38. The Agency does not dispute that OGC and PSHSB did communicate about Pintro and that OGC did reach out to Pintro's supervisor Mr. Nakazawa, but the Agency maintains that these communications were not for the purpose of monitoring Pintro. MSJ at 35–36. The Agency argues that neither of these communications was an adverse action under Title VII, and that there were legitimate, non-retaliatory reasons for each communication. MSJ at 37–39.

### 1. Adverse Action

As discussed in Part B, above, even though a plaintiff does not need to establish each and every element of a prima facie case in order to defend against a motion for summary judgment, she still must show that she "has suffered an adverse employment action." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). To establish an adverse action in the context of a retaliation claim "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (quotations omitted). An employee that has reported discriminatory behavior is protected from materially adverse actions that "produces

injury or harm," not "petty slights or minor annoyances." *Id.* at 67–68. Of course, even if a plaintiff has suffered an adverse action, his employer is still entitled to summary judgment if it can "assert[] a legitimate, nondiscriminatory reason for [the] adverse employment action," and if the plaintiff fails to produce "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008).

### *a. OGC Monitoring*

Pintro alleges that OGC was monitoring her performance in a manner "not uniformly applied across the workforce" or consistent with normal agency procedure and, thus, that it was an adverse action. *Aldrich v. Burwell*, 197 F. Supp. 3d 124, 132 (D.D.C. 2016); Opp'n at 27-29. Monitoring an employee's activity or whereabouts is not generally a materially adverse action. *See Aldrich*, 197 F. Supp. 3d at 132 ("[C]ourts . . . are near unanimous in concluding that close scrutiny, monitoring, or tracking of an employee's whereabouts—without more—simply does not rise to the level of a materially adverse retaliatory action sufficient to survive a motion to dismiss."). In instances where monitoring has been found to be an adverse action, it is when the "monitoring is so extreme and intrusive as to constitute harassment in its own right," or when it "is not uniformly applied across the workforce" and has caused a specific injury or harm. *Id.* at 133–34 (collecting out-of-Circuit cases). Nonetheless, even disparate monitoring is not necessarily enough on its own to qualify as an adverse action. This Court has noted that "[a] 'petty slight' is still a 'petty slight,' even if that slight is disparately applied." *Id.* at 134 (collecting cases in which closer scrutiny of an employee, without more, did not constitute an adverse action).

The monitoring Pintro alleges is not an adverse action because she has not presented evidence sufficient for a jury to find that she was monitored in a way that was at all atypical or harmful in such a manner that would dissuade a reasonable worker from making or supporting a charge of discrimination. Pintro alleges that her managers were required "to report on her performance every two months," and specifically states that OGC attorneys Launer and Standiford required Kravetz, the Chief of Staff for PSHSB and Pintro's direct supervisor at CCR, to "periodically" report on Pintro's activity. Compl. ¶ 38; MSJ Ex. B at 33–34; MSJ Ex. K at 2. Pintro bases this allegation on several pieces of evidence, including a statement made by Kravetz in her affidavit regarding her knowledge of Pintro's potential permanent transfer from IB to the PSHSB. MSJ Ex. B at 34; MSJ Ex. K at 3. This is a mischaracterization of Kravetz's testimony. Kravetz testified that while Pintro's potential reassignment was being worked out, she "generally spoke with Ms. Standiford every couple months, and if [Standiford] was not available, with Ms. Launer." MSJ Ex. K at 3. There is no indication at all from this testimony that Kravetz was periodically reporting back to OGC, as opposed to simply talking to OGC once a while, as needed. Pintro also points to "Sarah Van Valzah's reaction" when Pintro emailed Van Valzah to ask why she was being detailed to PSHSB again instead of being moved there permanently. MSJ Ex. B at 36. Van Valzah directed Pintro to "check with OGC." *Id.* This does not suggest monitoring. Finally, Pintro points to the email from Nakazawa that indicated OGC had contacted him about Pintro's August 2016 deposition, which is addressed separately below. *Id.*

In an attempt to demonstrate that the monitoring she alleges was not normal agency procedure, Pintro points to Admiral Simpson's testimony that the contact between OGC and Kravetz was "surprising." Opp'n at 28; MSJ Ex. A at 5. Pintro says this "demonstrates that [the Agency] was not acting in the course of their usual conduct." Opp'n at 28. However, as the

FCC points out in its reply, Admiral Simpson's statement was that "[he] *would* be surprised . . . [to] *find out* that someone outside the [PSHSB] was monitoring her performance," not that there was actual monitoring of Pintro's performance that he found surprising. Reply in Supp. of Def.'s Mot. for Summ. J. at 20, ECF No. 24 (emphasis added); MSJ Ex. T at 10, Dep. of Admiral David G. Simpson, ECF No. 20-21. This was a response to a hypothetical. In reality, Admiral Simpson testified that he was not aware of any efforts by OGC to monitor Pintro's performance. MSJ Ex. T at 10. Contrary to Pintro's contention, Admiral Simpson's testimony does not "demonstrate that [the Agency] was not acting in the course of their usual conduct." Opp'n at 28. Nowhere does Pintro establish normal agency policy regarding monitoring employees involved in ongoing settlement discussions, much less that OGC was not following that policy.

Pintro has not demonstrated that OGC was monitoring her to such a degree that would allow a reasonable juror to conclude this was an adverse action. Even assuming that she presented sufficient evidence for a jury to believe her version of the facts, she has nonetheless failed to demonstrate how "a reasonable juror could find that [she] suffered an adverse action." *Czekalski*, 475 F.3d at 365. Pintro presents no case law supporting the notion that the level of monitoring she describes can be considered adverse. *See* Opp'n at 27–29. Pintro states that "her life was made worse" as a result of this monitoring but her only support for this conclusory statement is the allegation that OGC held up the transfer that Admiral Simpson had promised her. MSJ Ex. B at 34–35, *see* Opp'n at 27–29. As previously explained, the record evidence does not support Pintro's account of her conversations with Admiral Simpson.

### b. Contacting Nakazawa

Pintro also points to the fact that OGC notified Nakazawa of her August 2016 deposition as an adverse action against her. Compl. ¶ 38. As with her allegation of monitoring, Pintro

points to no case law suggesting that, on its own, OGC notifying Nakazawa of her deposition or her whereabouts can be considered a materially adverse action. *See* Opp'n at 27–29. Pintro does correctly point out that the D.C. Circuit held, in *Lathram v. Snow*, that when an employer violates its own policies to conduct an adverse action, this violation raises an inference of pretext. 336 F.3d 1085, 1093 (D.C. Cir. 2003) (inconsistency in the Agency's process can show discriminatory motive). Opp'n at 27. However, Pintro has shown neither that OGC's actions were adverse nor that the Agency violated a standard procedure by contacting Nakazawa.

Nor does Pintro explain how she was injured by OGC reaching out to Nakazawa about her deposition. She states that OGC's collective actions toward her, including the email to Nakazawa, "stymied" her "professional progression" and "ruin[ed] her reputation." Compl. ¶ 38; Opp'n at 29. However, Pintro admits that no actions were taken by Nakazawa as a result of his learning about her deposition and she identifies no evidence of harm she suffered because of this communication from OGC. MSJ Ex. B at 62, *see* Compl. This Court, and the D.C. Circuit have each rejected harms that are notably more concrete than this phone call as insufficient bases for Title VII suits. *See, e.g.*, *Bridgeforth v. Jewell*, 721 F.3d 661, 665 (D.C. Cir. 2013) (rejecting the failure of U.S. Parks Service supervisors to nominate a police officer for awards as too speculative to support a retaliation claim); *Wilson v. Mabus*, 65 F. Supp. 3d 127, 134 (D.D.C. 2014) (holding that an employee who did not receive a shift change that his supervisor had recommended lacked a retaliation claim because this did not "result in any objectively tangible harm"); *see also Forkkio*, 306 F.3d at 1132 (holding that the placement of a particular manager as employee's supervisor and that manager's "alleged undermining of [the employee's authority]" were not adverse actions because while "[the manager's] supervision of [the employee] may have caused him subjective injury, . . . it did not objectively harm his working

conditions or future employment prospects"). In short, "purely subjective injuries, such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions," *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (quotations omitted), and Pintro has not even explained how Standiford's call injured her subjectively.

Pintro also does not explain how a reasonable juror could find that the communication from OGC to Nakazawa was adverse to her. In fact, Pintro herself quotes Standiford's testimony that "it never occurred to [her] that Ms. Johnson was asking [her] to do anything out of the ordinary." Opp'n at 30 (quoting MSJ Ex. I at 9). Pintro seems to suggest that the burden is on the Agency "to cite [an] Agency policy or any other instances where OGC monitored an employee or discussed an employee taking time off for an EEO deposition with an employee's supervisors." *Id.* at 29. However, since Pintro has not established how, if at all, this communication was an adverse action, the burden has not shifted back to the Agency to defend itself in the way Pintro suggests.

### 2. Legitimate, Non-Retaliatory Reasons

Pintro's failure to explain how she suffered an adverse action is enough to warrant summary judgment for the FCC on this claim, but this claim also fails because she has not shown that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *See George*, 407 F.3d at 41 (quoting *Tex. Dep't Cmty. Affairs*, 450 U.S. at 253). The FCC explains that "OGC's contacts with [Pintro]'s supervisors were a result of the Agency earnestly engaging in settlement negotiations with [Pintro]. . . and following the legal advice of the . . . AUSA representing the Agency in [Pintro]'s first lawsuit." MSJ at 3. This explanation is consistent with the record evidence before the Court, and Pintro has again failed to

point to anything beyond her own conclusory and unsubstantiated testimony that would support her characterization of events.

*a. OGC Monitoring*

Pintro's claim that OGC "required one of [her] managers to report on her performance every two months," Compl. ¶ 38, is based partially on Kravetz's statement that she "generally spoke with Ms. Standiford every couple months, and if she was not available, with Ms. Launer" about Pintro's potential reassignment as part of the settlement discussions between the Agency and Pintro. MSJ Ex. K at 3. Kravetz's statements do not suggest that this communication was mandated by OGC or that it occurred on any type of regular schedule, as Pintro seems to suggest. Rather, both Standiford's deposition and Kravetz's affidavit state that these conversations were only for the purpose of discussing Pintro's potential reassignment, which was an aspect of Pintro's ongoing settlement discussions. MSJ Ex. G at 16–17; MSJ Ex. K at 3. Additionally, Pintro points to the email sent to her from Van Valzah, in which Van Valzah states that "it is [her] understanding that a reassignment action is currently a component of a settlement offer in your pending litigation; accordingly discussion related to the reassignment should occur between your counsel and the AUSA." MSJ Ex. L at 1. This communication does not suggest that Pintro was being regularly monitored contrary to agency policy. Rather it explains that OGC was involved in her reassignment because of the ongoing settlement discussions. To the extent that any monitoring occurred, then, the Agency has produced unrebutted evidence of legitimate reasons why OGC was paying attention to Pintro—they were in the process of negotiating a settlement with her that concerned a transfer involving the organization with which they communicated. There is no evidence that this was pretextual.

The agency's explanations are consistent with the evidence presented. The Agency explains that "OGC is routinely required to discuss ongoing litigation with employees' managers in order to gather information to adequately defend the Agency and to discuss whether settlement proposals are feasible" and that this communication was "legitimate conduct[] in the course of preparing the Agency's defenses and in the context of settlement negotiations." MSJ at 35. In response Pintro cites no evidence suggesting pretext, but only argues that "[d]efendant fails to cite any Agency policy or any other instances where OGC monitored an employee." Opp'n at 29. She errs in suggesting that the Agency has the legal burden to explain its actions in this much detail. Pintro incorrectly suggests that she does not have a burden as the plaintiff to produce evidence supporting the pretextual nature of the agency's actions in response to the agency's evidence of their actions being legitimate and non-retaliatory. *Id.* at 29–30. In fact, Pintro has the burden of responding to these legitimate, non-retaliatory explanations for their actions with evidence that would allow a reasonable jury to find that the employer's stated reasons were not the actual reason for their actions. *Walker*, 798 F.3d at 1092. Pintro has failed to put forward evidence suggesting such pretext.

### b. Contacting Nakazawa

Pintro's suggestion that there were no legitimate reasons for OGC to reach out to Nakazawa the day before her deposition is similarly not supported by the evidence. Pintro claims that there was no legitimate non-pretextual reason for Standiford to reach out to Nakazawa because doing so was not routine agency policy. Opp'n at 30. In so arguing, Pintro notes Standiford's statement that "she was merely relying on the advice of AUSA Johnson and that 'it never occurred to [her] that Ms. Johnson was asking [her] to do anything out of the ordinary in contacting Ms. Pintro's supervisor.'" *Id.* This is not "evidence that this was not a

routine procedure," as Pintro states, *id.*, but in fact is quite the opposite, as it suggests there was

nothing unusual about the request from the AUSA who was responsible for the litigation in

court. Standiford explained that "it never occurred to [her] that PSHSB would not have known

about [Pintro's] pending EEO case" and that "[AUSA Johnson] told Ms. Pintro it was her

practice to advise the employee's supervisor that the employee did not have to take leave to

participate in [a] deposition." MSJ Ex. I at 9.[4] Pintro, who cites nothing but Standiford's

deposition on this issue, has failed to refute this legitimate and non-discriminatory explanation of

why OGC would reach out to her supervisor.

Standiford's testimony that she reached out to PSHSB at AUSA Johnson's request is

unrebutted and inconsistent with Pintro's broader allegations of retaliation because, if Standiford

only reached out at the request of the U.S. Attorney's Office, this is weak evidence of a

retaliatory motive originating at OGC. Even if OGC were meddling with Pintro's employment

and supervision because they were unhappy with her first lawsuit, this phone call would not be

evidence of such a plan because there is no dispute that it was instigated by AUSA Johnson, not

on Standiford's own initiative. Nor would it make sense to suggest that AUSA Johnson was

participating in the retaliatory scheme — she had been striving to settle the lawsuit for the better

---

[4] AUSA Johnson's concerns in this regard were well-founded. EEOC regulations dictate that complainant employees "shall have a reasonable amount of official time" to pursue their complaints." 29 C.F.R. § 1614.605(b). The failure of an agency to abide by this regulation can be the basis for a retaliation claim, either in administrative proceedings or in federal court. *E.g. Yonemoto v. McDonald*, 114 F. Supp. 3d 1067, 1092–93 (D. Haw. 2015); *Celest P. v. U.S. Postal Serv.*, EEOC Appeal No. 120181407 (June 20, 2019), 2019 WL 2724726 at *6–*7. "[T]here is no express provision in Title VII or its regulations granting an employee the right to administrative leave for judicial proceedings," *Moore v. Summers*, 113 F. Supp. 2d 5, 28 (D.D.C. 2000) (quoting *Shelborne v. Runyan*, No. Civ. A 94-0641, 1997 WL 527352, at *16), but, nonetheless, the denial of such leave can lead to further litigation which AUSA Johnson would have every reason to try to avoid even if the government would likely prevail. *See Wiley v. Glassman*, 511 F.3d 151, 158–59 (D.C. Cir. 2007); *Moore*, 113 F. Supp. 2d at 28–29.

part of a year and would have had no reason fuel further litigation against her client agency by encouraging OGC to retaliate against and mistreat Pintro.

Pintro again here presents no evidence or case law suggesting that the OGC's actions were taken for pretextual reasons, despite her burden to do so. *See* Opp'n at 29–30; *Walker*, 798 F.3d at 1092. Summary judgment is therefore appropriate on this claim because she does not rebutt the Agency's legitimate non-retaliatory reasons for their actions in a manner that would allow a reasonable jury to find pretext.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: November 15, 2019                                    RUDOLPH CONTRERAS
                                                            United States District Judge